Good morning, your honors. May it please the court, my name is Stanley Brown, and I represent Duquesne University of the Holy Spirit. Under the court's decision in Great Falls and Carroll College, the faculty at Duquesne University are patently beyond the board's jurisdiction. It is undisputed that they satisfy the three tests articulated in Great Falls and reiterated and reaffirmed in Carroll College, and as a matter of fact, the board so held. So Duquesne has a religious educational environment, it's non-profit, and it's affiliated with both the Catholic Church and the Spirit and Order. And that was the sum of the Bright Line test. That is exactly the sum of the Bright Line test, your honor, which we satisfied. There's no doubt about it. The board found that in its decision. Given that we meet all of those tests, and again it's undisputed, as the court stated in Great Falls, the NLRB must, must decline to exercise jurisdiction. So hypothetically, had the university issued a statement saying our tenured faculty and our full-time faculty are part of the religious educational environment that the university seeks to provide. However, by contrast, our adjuncts are simply temporary employees, and we simply require them to teach the substance of the course, and I'll make it even easier, without any reservation in terms of religious belief adhered to by the university. In that circumstance, where the university has made such a public statement, would you take the same position that Great Falls covers that case as well? Well, first, your honor, there's no statement like that in this case. That's why I said, hypothetically. Right. Would you still take the position that Great Falls covers that case? I would, your honor, because Great Falls has that bright line test. And it's always possible that what position that the university takes today about their faculty or adjunct faculty could change tomorrow. Because the goal of the university, or the mission of the university, is a religious one. And how they apply that mission, and how they advance that mission, should be up to the university, and that may change. That's the point of my hypothetical. The university has a religious, let me put it this way, religious purpose in which to present a religious educational environment. In my hypothetical, it has chosen to do that by having a unit of instructional personnel who are in no way bound by any religious environment that the university wishes to provide. The university has chosen, in other words, to present its religious education with this unit that is not bound by any religious limitation. What you're saying, your honor, if I could repeat it, is that what you're saying is the university has taken the position in this particular hypothetical that a particular group of faculty only has a secular mission and nothing else. And I would still say that under the great false test that there is no more jurisdiction. And that's because the way a university advances its religious mission is not static. It can change from time to time. There may be a time when the university decides that they want faculty members that at one point they thought they concluded were only secular to have more religious duties. And I think they need the freedom to be able to do that without intrusion by the board, without the board being involved in testing whether they are in fact secular or not. What I was trying to follow through on, just one moment, is we're taking the university in my hypothetical at its word. And that seems to be the board's position. And I understand your point about this case illustrates how the board's position doesn't work. But that was the way I read the board's concern, if I can put it that way, that you could have a situation where great false speaks too broadly. And taking the university at its word, if in my hypothetical situation you had such a statement, then the board would argue it could properly exercise it. Well, they might make that argument. I don't agree with it. But the fact is that on this record there is no doubt about how the university feels about its adjunct faculty and what it asks of its adjunct faculty. There's all kinds of record evidence of the university basically saying we are asking and we are encouraging our faculty, our entire faculty, not just our adjunct faculty, to be involved in our religious mission. They're a part of that religious mission. They go to an orientation program where the university talks about the religious mission. The university has a center for the Catholic intellectual tradition where it gives all faculty information about its religious mission, about the connection between faith and reason. The record is full of the university encouraging and asking faculty to be involved and a part of that religious mission. There's no doubt about that. I don't want to speak for Judge Rogers, but I understood your question to be exploring the limits of the great false rule, if there are any. I thought your answer may be sliced a little too thin or maybe I didn't understand it. I thought the argument you had been making was the very nature of these religious affiliated schools and trying to create a religious environment for education has little to do with the particular subject matter that's being taught. You could teach a class in calculus, a completely secular subject. I thought your argument was that that is one component to an overall environment that the college is trying to create that has a religious mission, but maybe I misunderstood. I think that's true, Your Honor. I also would say that the expectation is that all faculty have to contribute to that religious mission and that the board shouldn't be involved in parsing and saying, Well, these people, because faculty are so important to the communication of that religious mission to students, because isn't that what it's all about? So, the board shouldn't be involved in parsing, you know, this group of faculty. What is the contribution that a teacher of calculus makes to the religious mission of diploma? Well, I am not a theologian, but what Duquesne asks all of its professors to do is to connect the spiritual and the scientific faith and reason. That is a very important component of the Catholic intellectual tradition, and that is what they expect of all of their faculty. I understand that, Duquesne, but what if there was a religiously affiliated college that said, Our math instructors just teach math. Don't begin with prayer. Don't make any connections to divine design or purpose. Just teach math. That's your job. Would they be contributing to their religious purpose? Well, I think the answer is yes to that, Your Honor. I think that's what Duquesne and I think that's what many other Catholic universities feel about what their faculty does. Whatever they teach. Mr. Brown, you were mentioning the dynamic nature of the university's faith mission and how it might change over time in response to Drodger's hypothetical, and I wanted to explore more why the board's approach is troubling to you in light of that, because it would seem that the board's approach is actually quite advantageous to a university that thinks, you know, during one period when the market for these adjuncts is very difficult, it might want to follow the lines of Drodger's hypothetical and say, you know, this is anybody and everybody, this is just a calculus teacher. If it wants to change, it simply needs to hold out that these faculty are part and parcel of the heart of the religious identity of the university, and as I understand it, and obviously we can ask the board, in that instance, that would resolve, that would change the outer boundary of the exemption. Well, I think one advantage, and why I think the great false test is the right test, is you don't get involved in those kinds of issues. You're not in a situation where you have the potential of the board saying, well, in this case, really, they are not involved enough in furthering the religious mission of the university. It's the university that determines how faculty can best advance its religious mission, not the NLRB, and that's one of the problems with the NLRB, a major problem, because they sit in judgment under this ruling on what the religious mission is, and not only that, the judgment is a very overt religious one that they're acquiring. That's not the case. So say more about that, because the thing that I'm grappling with is why holding out is an objective and non-entangling test at the whole school level, but it becomes a first amendment entanglement problem if it's applied to the proposed bargaining unit, and I understand that you're saying, you know, with a history of the board's completely religious test, and it's, you know, what's the other one, that substantial religious character test, you have a history of knowing that the board is going under the hood, but as I understand, what the board was seeking to do here is to say, okay, we hear what the D.C. Circuit said in great false, and we're going to allow the university to just tell us, in or out, and say these people, it doesn't have to be because of what they teach, but to say these people are part of the heart of our religious mission as the whole faculty is, period. Well, Duquesne did tell them, but they ignored it, because they... But not in the context of litigation, I mean in the context of holding out to the public, which is the analysis. Well, two things. First of all, the advantage of great false test is it's a bright line, and you don't get involved in determining, is the university religious enough? How do they advance their mission? Do they make sure that faculty are religious enough? So it is a... So I don't understand why you're resisting Judge Rogers' hypothetical, because that's never going to happen at Duquesne, right? Not a chance. There's no chance in the world that they're going to say that. And if a college university wants to do that, that may be a very different case than we have here. That may be an interesting question, and it's hard to imagine that happening, but who knows? Things change. Yes, I think that's right, Ron. But going back to Judge Pillard's question, the problem with this test, I mean, the board didn't... They basically rejected the great false test, and they tried to put a spin on it that they really didn't. They were incorporating another problem. But what they try to do is create a test that has all kinds of intrusive impacts. So first they say that a faculty member has to have a specific religious function. So now they're defining religion, and they're defining what that means. Then they say, not only does it have to be a specific religious function, but it has to involve basically overt kinds of religious activities. And that includes proselytizing. That includes religious counseling. And then if you look at the record and you look at the decision, they make all kinds of fine-line conclusions about whether Duquesne has even fit into those categories. And that's why we have a three-day hearing, thousands of pages of exhibits, and the board issuing a ruling that parses everything Duquesne does according to its own standards of whether or not that's religious enough and whether the faculty is religious enough. And that not only violates great false, but it violates Catholic bishop as well. So maybe we can separate out two things. What I hear you saying is that they said they were applying an objective holding out test, but they in practice were much more intrusive, and in deciding whether Duquesne held itself out as religious or not, it was using its own idea of a very hard-nosed, proselytizing version of religion. Is that right? Yes. What if it applied the holding out test the same way that great false defined it and then said, we will take your word for it? In fact, what the board, I think the regional director here, found that these employees were not held out as having any role in creating or maintaining the college's religious environment at the time. And I understand that that's not, as you put it, not what Duquesne feels or believes about its adjuncts. But if the tests were applied the same way that it's applied at the institution level, I'm just still trying to understand why what is bright line and non-entangling at the institution level, if you apply it to the bargaining, the proposed bargaining unit, it no longer works that way. Because at the institution level, it's just this relatively simple question and a bright line question. Is it religious? Does it hold itself out to being religious? And the purpose of the test is to make sure that a university, just trying to avoid jurisdiction, doesn't pass that test. When you look at the board's holding out test, it's entirely different. Because it asks all kinds of questions about, first of all, it sets religious tests or it defines religion. It has to be a specific religious function. That, I think, violates constitutional avoidance. Tell me more concretely. It defines, you said, it defines religion. Are you referring to in terms of proselytizing or in terms of... Well, it's twofold. Liturgical content in the... I think it violates constitutional avoidance in two ways. First, it defines a test where the faculty has to have a, quote, specific religious function in maintaining the religious mission of the university. It has to be held out as having that. It has to be held... And that's the thing that I think... According to its judgment. According to its review of the record, yes. It has to be held out as that. And so my question is, I understand that you think they applied it in a way that you can take your word for it. But my... And I think Judge Rogers hypothetical, perhaps, also was saying, if they did... Wouldn't it be relatively easy for it to say, and we need our adjuncts to let us tell you why, period. First, it says that there has to be a specific religious function. So it is... Held out as having. Yes, that's true, Your Honor. As contributing to the religious environment. But that's sort of... That really comes down to a test of religiosity. But then it goes even further in violating constitutional avoidance. Because then it says, not only do you have to hold them out as having a specific function. But here's the kind of things we look at. Do you propagate? Do you provide religious counseling?  And it's very different than the approach to religion that Duquesne utilizes. And it's very different than the expectations of what its faculty should be doing to advance its religious mission. And the record is clear that it's asking its faculty, including its adjunct faculty, in many different ways to do that. To advance the religion. Tell me what you would say. The record is clear that it is holding out its religious faculty as part of the heart of the religious entity that is the university. To you, the top three things that make that clear are? Oh, my goodness. Look at what it says in the handbook. Look at the... I think the orientation program that it has. And, of course, the board's answer to that is, well, they're not required to go. It's not mandatory. So somehow it doesn't count. Again, they're making religious judgments. But the orientation program, where adjuncts are given materials, it clearly asks them to work toward understanding our spiritual values and incorporating them in your work. And we find that where in the record? That is at Joint Appendix 696 and 707. And what's the third? Well, all right. Let me... So the orientation program... And another thing that they say in the orientation program is, Utane scholars are hired, rewarded, and retained to support the mutual enrichment of faith and reason. I would also note the core, the religious core program. And that program is required of all first-year students. It involves courses like theology, ethics, and philosophy. And, by the way, about 50% of those courses are taught by adjunct professors. And if you look at what it says about the core program, it talks about the spiritual aspect of the program for its students. And, again, adjuncts are part of that. And they're expected to help communicate the spiritual issues, the issues of faith and reason. So if I wanted to be an adjunct at the university, if I were to read the handbook, all right, I would see a statement in there about my faith and reason obligations. Yes, you would. And you would also see that if you went to the orientation. Right, but suppose I don't go. If it's an invitation, it's not mandatory. Yes, if it's an invitation, faculty are encouraged to go to that. And you could fire me or you could decide not to rehire me because I was unaware of what the orientation was. Or because you ignored it. Right. And, of course- That's a different issue. We were looking for the top three things. All right. That was the learning that in teaching calculus, I have this additional responsibility. Yes. The other thing I would mention, and I think this is also very important, is that the university has a whole series of programs. They have a center for Catholic intellectual tradition that basically involves programs and forums to help its faculty understand Catholic theology, Catholic intellectual tradition, and the connections between faith and reason, and how that can be applied in the classroom. Stick with us for a moment. There are a lot of universities that don't identify themselves as having a religious environment that also have core religion courses, that have centers on religion. And we're just trying to zero in on the holding out by Duquesne. In other words, if what was in your brief had basically been something the university had issued generally, that would be a holding out. And one way to read the board is, you take your word. End of discussion. But we don't have that here. And so now the board is trying to look for signs of that. And that's where you say there's this trolling and irresponsible entanglement. Yes, Your Honor. They don't take our word. And the word isn't there in the sense that I thought Judge Pillard's questions were zeroing in on. Where is the holding out to the public? Well, again, some examples of that. And I talked about, and not only to the public, but the faculty itself. I talked about the programs in the Center for Catholic Intellectual Tradition. And I talked about the fact that they actually have mission grants available, specifically for adjuncts, to help them and to encourage them to put together proposals to make those kinds of religious connections as part of their teaching. The faculty handbook says in the section called, the role of the faculty. Without the faculty, the university would be unable to prepare its students intellectually, professionally, aesthetically, spiritually, or ethically for the responsibilities of life. I don't want to cut you off if you have more. I was going to go into a couple of other things, but I'm glad to try to answer your question. So, identify the further ones you want, and then I do have a follow-up question. Okay. You had said programs, the center, mission grants. I talked about mission grants. I talked about orientation. The Internet site for the adjunct faculty called Getting Started states, under the first things, that Duquesne's religious mission provides a context and guide for all we do at Duquesne. The core curriculum page on the website states that Duquesne's core curriculum provides a common educational experience for undergraduate students, which uniquely expresses the spirit and Catholic identity of Duquesne University. As I said, about half the courses in the core are taught by adjuncts. And those are not the – I mean, I understand part of the adjunct faculty is exempted because they are involved in religious education, but you're talking about those that are in the proposed bargaining unit approved by the board. Yes, yes. In other words, the core are taught by faculty. The only group that was specifically exempted are people who are in the theology department. So, you could be a philosopher teaching in the first year. You could be an ethics professor. You could be a sociology professor teaching in this core curriculum, you're saying, and be an adjunct. Absolutely. And according to the board's logic, you wouldn't be covered. Yeah, and according to the board's logic, if you teach in the theology department, well, that's okay. Then you're exempt. But if you teach philosophy, if you teach ethics, and those, of course, also involve the kinds of issues that we're talking about, the connection between science and religion. So, Mr. Brown, here's one of the things that's difficult. On page two of your brief, you mentioned that Duquesne does bargain with its non-academic staff. And so, we have an unanswered question. It's, you know, on the one hand, Catholic Bishop talks about the institution. Great Falls talks about the faculty. And they also talk about the institution. And Carroll College, we talk about the institution. But it's clearly not the entire institution that's covered. So, the question is, what is it that is the heart of the religious mission that is, when I say covered, I mean actually exempt. What is it about the heart of the religious mission, you know, which body of staff are exempt? And we need to draw a line. And we're just probing, you know, why would it be that, you know, what about graduate teaching assistants, staff or faculty? And how do they know? And how do we know? Well, that's sort of a multi-part question, Your Honor. I apologize. And that's okay. It's your job to do that. But what I'm going to say is, the first is, there is a test already. And it's a test that's binding on the circuit. So, I... But I don't take it to cover the whole institution, even though we may have put it that way. And I don't think you disagree, do you? Well, I... First of all, this case only involves faculty. But do you disagree? You don't claim that the religious carve-out covers the cafeteria workers and the janitors and the... I wouldn't be speculating on that, Your Honor. I think that this case is, in a sense, an easy case. Because it involves faculty. And faculty are the core of the communication of the religious mission of this university. So, whether Great Falls extends to cafeteria workers...  Yes. Yes. As a matter of grace? As a matter of grace, did you say, Your Honor? Yes. Well, it chose to do that. And certainly, Duquesne, in being before you today and going through this process, which has taken us six years, does that because faculty are so critical to the communication of this religious mission. Without faculty, it couldn't be communicated to students. And that's why they ask faculty to do it. That's why they ask faculty to be involved in the advancement of that mission. All faculty. And the board shouldn't be simply in the position of judging whether they do it in the right way, whether they are religious enough. And so, we don't have to get beyond faculty and beyond the facts of this case. The facts of this case, we would submit are pretty clear. I've probably taken a lot more time than... Why don't we hear from counsel for Aneka Securi and we'll give you some time to rebuttal. Thank you, Your Honor. Good morning, Your Honor. Good morning, Your Honor. And may it please the Court. Erin Murphy on behalf of the Anika Securi Association of Catholic Colleges and Universities. For 40 years, the board's been trying to assert jurisdiction over teachers at religious schools. And for 40 years, the Supreme Court and then this Court has repeatedly told the board no. There's no reason to reach a different conclusion here. The first problem... Ms. Murphy, what do you do with Judge Rogers' hypothetical? If we have a situation where a university has not expressly held out a subset of the faculty as serving the religious mission of the university and the school, what happens then? I think the right answer is the school is still exempt. And I think the right way to understand Great Falls and Catholic Fisher before... You used the language of the school in Great Falls and Carroll, but this issue wasn't presented before. Sure, but the basic question... These are constitutional avoidance cases that are about whether the act should be read and giving the board jurisdiction in a context that's likely to raise First Amendment concerns. Here we have a school that bargains with cafeteria workers. So they have decided that there's one subset of the university community that could be subject to the board's jurisdiction. The question we're asking now is, unless you can show us what they have, if they haven't held out their adjunct faculty as being part of the religious mission, why aren't they adjunct faculty? For that purpose, like the cafeteria workers and not like the members of the Department of Theology. Sure, and I think that the basic reasoning that I take Great Falls and Catholic Bishop to be establishing is that a school holds out its teachers and its faculty members as religious by virtue of holding itself out as religious. That's the bright line Great Falls draws. We don't want to get into... Let's look at which particular teachers further the mission and which ones don't. Judge Rogers' hypothetical was a school to carve those out. I understand. And the question here is, has decayed by not specifically identifying the adjunct? Is that more like the carve-out of Judge Rogers' hypothetical? And with all due respect, that's why I don't think the carve-out really kind of solves the problem. I mean, I think that in practice, what you're really going to end up doing is getting into these First Amendment-sensitive debates about, well, does the board like it? Did you really say it or not? So what's your answer to the question of where has decaying held out its adjunct as being part of its mission? It's held out its adjunct as being part of its mission by holding itself out as being a religious institution. And I took you to be... I'm sorry. No, I mean, I think the core of our view of the position that Great Falls is establishing is that, you know, that is the holding out. If you go back to Great Falls, it specifically talked about one of the reasons the holding out test for the institution was the right test was because that would tell faculty, you're coming to work at a school that has a religious mission. And so we're not talking about non-teaching staff at a religious college. I'm not aware of any case that has applied the Catholic-Bishop analysis, even though the cases do speak in terms of the institution. You just made the equation, and I take it intentionally, that when a school holds itself out as a religious school, it's holding its faculty out as religious, by holding itself out. That's right. That's right. I mean, I do want to be clear that it is not settled law, the question of what happens once you get the other teachers. We're probing the logic. Yeah, I know the question you asked earlier about, you know, oh, it's clear that kind of the staff is off to another side. I mean, the board itself is in disagreement about this right now. So that is a question that I just want to be clear. It's not an issue in this case, but I don't think, you know, that it's as simple as the board wants to suggest that, oh, it's already well established, you know, that there's a line on the other side. But that said, I mean, I do think it's well established that wherever the line is, if there is a line, teachers and, you know, all faculty members are on the side of being within an institutional exemption that exists once you establish what the statute set forth in Great Falls. Did you say the board itself is in disagreement on this? You're referring to this being? The question of whether the Catholic bishop exemption applies outside the context of teachers to other types of staff members. So it's an issue that's come up in some other contexts. So I don't want to, you know, suggest that that's sort of a settled issue. It's not a question this court has ever had to address. So it's been a dissent? There's been a dissent. Right. There's also been a majority. Yeah, there certainly has. But it's, you know, most courts haven't confronted the question. And frankly, this court really doesn't have to confront it here. And hasn't the general counsel of the board taken the position that Pacific Lutheran is suspect? Yes, and rightfully so in my view. I mean, for purposes particularly of being in this court, I mean, I do think it's worth recalling that Pacific Lutheran doesn't purport to be consistent with Great Falls. I mean, on its face it says it's rejecting the Great Falls test. It believes it understands that under this court's precedent it would not have jurisdiction in a case like this one. And it rejects this court's precedent and says it believes that this court overreached and that this court implied, you know, imposed too stringent of a test by giving the institution an exemption instead of looking at the faculty members. So just as a matter of- Too stringent, they were talking about the affiliation prong and they were saying it doesn't necessarily need to be affiliated with a formal- No, no. Instead of going into what the particular faculty members do. Now, you also are saying going into what they do. Help me out with why even applied in, you know, a way that would be the most pleasing- I realize the test is not pleasing to the jury, but- Sure. Isn't there, like- I'm trying to understand why if the holding out test is helpfully objective when it's looking at the institution, it is impermissibly entangling if it's looking at a proper bargaining unit. Sure. I think it goes back to where I started out, which is if all the board asked really was, you know, if the question were, you know, are your teachers held out as being part of the religious mission, that question should be answered by virtue of, oh, you're held out as a religious university. The problem isn't the objective nature of the inquiry. It's that they want to go beyond that. I mean, the specific religious function test is just exactly the kind of inquiry that's brought with First Amendment concerns. And I think it's important to go and look at how they articulated this test in Pacific Lutheran. I mean, it's not just that they took kind of a very narrow view of, you know, you're only held out as advancing religion if you're held out as incorporating religion into your curriculum or advising students. It's also the things that they said don't count. I mean, they specifically said that generalized statements that faculty members are expected to support the goals and the missions of the university. So saying that your faculty member is expected to support and advance the school's religious mission, they said that doesn't count. I mean, I don't understand how you can have a test that says if you hold your religious teachers out, you know, your teachers out as advancing our religious mission, that still doesn't qualify as holding your teachers out as advancing our religious mission. And the fact that the board thinks they can draw that sign of a distinction, to me, just underscores the wisdom of Catholic bishops and Great Falls in saying, you know, we can't have the board making these kind of inquiries unless Congress tells us that's really what they want the board doing. Because the board's inherently going to start drawing lines based on its own preconceived notions about what is sufficiently religious or completely religious or pervasively religious. So what if the board is merely trying to find evidence that it has been clearly communicated to the contingent, part-time, decentralized, hired faculty that they know that they are part of the heart of the school? I don't mean to be a broken record, but I think that that comes from the fact that the school holds itself out as being religious. So you would say that the cafeteria workers and the janitors actually should be covered. I mean, they should be exempt. I don't think my client has taken a position on this, but in terms of thinking about the logic of what this court and the Supreme Court were saying, you know, I think it's very difficult to then say, oh, well, you can't draw lines between particular faculty members, but you can draw lines between the faculty member and the person who doesn't know. And I would tell you, you know, I would point to, I mean, I think that that's consistent with the fact that Congress itself in the exemption to Title VII said, you know what, we're a little concerned with the idea of courts drawing those kind of lines, so we're not going to require courts to ask whether the employee furthers a specific religious function. But you keep saying we're going to ask whether the employee, we're going to make a de novo judgment about whether they further a specific function, but the test that the board has to offer is, are you, is the client holding those people out as furthering a religious function? They can define that function any way they want. Are they just saying these people are part of what we do here as religious, these people maybe not? Sure. And I think that the point of this whole line of cases is to say that at least as teachers and faculty members, that essentially there's a presumption that if you hold your university out as religious, you hold all the people who teach there and all the people who are faculty members there as being part of your religious mission. And I think that that's the basic thrust of these opinions. And, you know, it's important to remember that all of this is being done in the context of constitutional avoidance. Right. So you can certainly debate whether that's, you know, precisely the right line, if this were actually resolving the constitutional question, but in a context where what you're trying to do is say, you know, we want to be careful about reading a statute to require an agency that has no particular competence in determining what is or is not religious to make those kind of distinctions, then I think it makes sense to kind of err on the side of having a bright line. And once you have, I mean, this is an exemption that I'm also not aware of any court or any board decision that applies this exemption to religious hospitals, religious social service organizations. Well, religious hospitals are differently dealt with. I think that's because the act itself indicates that religious hospitals are covered. Right. So that's, you know. But the act itself is just a statute. And we're talking about the Constitution, constitutional avoidance. And so, again, I'm probing the logic and asking for your help in understanding the logic of the Catholic bishops. Sure. And in the wake of Catholic bishops, there were a number of cases raising the question of whether it was constitutional to apply the NLRA in the context of hospitals. And, you know, I think most courts resolve that by saying it was, in part because there's specific provisions in the NLRA that are designed to try to minimize the constitutional issues. And, of course, you would always have a backstop of RFRA now. And, you know, so I think that all of that is consistent, again, with the notion that the Catholic bishop rule is a constitutional avoidance rule, not a, you know, as-applied constitutional, you know, unconstitutionality of the act rule, in which case, you know, if that's what it were, I would understand that you might have to look at things more on a case-by-case basis. But the point is to say we don't want a case-by-case basis. All right.  Thank you. Good morning. I'm Heather Beard for the NLRB, seeking to enforce the board's order. So the first point that I'd like to make is something that Judge Pillard was discussing with opposing counsel. And I'd like to just reiterate what Judge Pillard said, which is the board's test here does not define religion. What the board is doing in the Pacific Lutheran test and has applied in Duquesne is respecting this court's decision in Great Falls with regard to not trolling through the university's belief and, indeed, holding out the university, rather having a test that requires the university to hold out its faculty as creating or maintaining a role in the religious environment that, and this is very important, that the university itself has held out as its religious environment. So both of these prongs, both holding out- Why haven't they done that in the faculty handbook, where in the very first paragraph they say, we are a religious institution, we support the teachings of the Roman Catholic Church. How could any adjunct faculty getting a job at Duquesne not know that, not understand that I'm joining a school that has a religious purpose? I think, Your Honor, they do. And that's the first part of the test, I'm joining a school that has a religious purpose. But they don't know that they themselves are responsible for and are going to be creating- Why wouldn't they know that? They're faculty. What does a university do? It doesn't just play sports, right? It teaches. Correct. And I think as your example earlier was, one of the things that it teaches, for example, is calculus. And so an adjunct coming to teach who does not have any of the benefits that a full-time tenured professor has coming to the university that doesn't require anywhere explicitly that the adjuncts in their teaching are going to create or maintain the religious environment- And that answer displays to me the crabbed view of the board about what it means to be a religious college and university, right? The idea that for a religious college and university, teaching calculus is every bit as important to what they are trying to accomplish as teaching about Thomas Aquinas. And it seems to me that Ms. Murphy's indictment, I'd like you to respond to it. She said for 40 years the board has been trying to intrude into this area with a deaf ear to what's going on in a religious college and university. I'll give you a chance to respond to her accusation. Sure. Accusation is the right word. Her description. Description, sure. No problem. In the board's view, in the 41st year, when it has this holding out test of what the faculty specifically do, going back to Catholic Bishop and the very important role we agree that faculty has in an institution, when you look at the holding out test, it is not a test that is the substantial religious character test. It is not a test that defines religion. It is a test where the board looks at facts as to how the university itself is holding out, not just itself as the university, but the specific role that the folks who come in and become adjunct teachers have in creating or maintaining that university. And that's why the board does not believe that it runs afoul of any constitutional avoidance problem, nor was this the issue that was presented in Great Falls. And so to the board, there needs to be some sort of a because phrase, which Ms. Murphy would probably disagree with, but I don't think that this is required by constitutional avoidance, that the board does not need to require a university to demonstrate why it is, how it is, that the religious environment that they themselves set forth, which the board agrees they set forth here for their institution, is one that their adjunct faculty is creating or maintaining in a specific way. And that's what the board's view is here. The board here did not fly in the face of 40 years of jurisprudence, but what it tried to do, mindful of the teaching of this court as well as in the Supreme Court, that there are Section 7 rights of employees that should not easily be erased. And in this instance, constitutional avoidance does not require that. How are we to view Pacific Lutheran as anything other than a rebuke of the jurisprudence of this court? That's certainly what the general counsel's position was. So how are we to view it differently? Well, in the board's view... In which case, this becomes a pretty easy case to resolve, doesn't it? Well, in the board's view, the test that the board had presented in Pacific Lutheran University, which the board's view is faithful in the sense that it refines the holding out test of the institution and applies it also to the specific... The general counsel disagrees with that, right? The general counsel has come out and said, that is correct. However, representing the board, the board's view in Duquesne, which is applying Pacific Lutheran, is that this test is faithful to this court's jurisprudence as well as to the Supreme Court's jurisprudence. And it's faithful to that in that it takes the holding out prong and it applies it to groups of faculty members, which is very core to what... Even though when we wrote in Great Falls and in Carroll College, we said, it's the institution, right? The institution that is exempt from jurisdiction. Although, as I believe we discussed earlier with Judge Pillard, the institution itself, the school admits, for example, that it bargains with, for example, its custodians. And I know that in Great Falls, there is room for a university to not be a bona fide religious institution if it doesn't hold itself out as such. Help me here with the board's statement in its Pacific Lutheran opinion where it says, the Great Falls test could deny the protections of the NLRA to faculty members who teach in, quote, completely non-religious educational environments if the college or university is able to point to any statement suggesting the school, but not the faculty's connection to religion. So, my question is, what I understand Duquesne's brief to be arguing and the arguments it made before the board is, that sentence betrays the board's misunderstanding of what Duquesne is. In other words, we don't have any faculty that's teaching in a completely non-religious educational environment. True. I would argue, I don't know if that statement from the board misunderstands, but I would say that what the board is saying is, it wants to be very careful in not denying protection to faculty that is in, for example, a non-religious environment. It also, here, acknowledges there is a religious environment, but what has not been demonstrated is that the faculty have a role, a specific role in maintaining or creating that religious environment. Go ahead. Would it satisfy the specific Lutheran cause, as the board understands it, if the university said, our faculty, whether full-time, part-time, permanent, or adjunct, if there was something explicit that wove in the full scope, including this bargaining unit as well as what we traditionally think of as the faculty, the tenured faculty, if it were clear as holding those faculty out as the heart of its academic religious mission, the board would have no problem with that. And they wouldn't be looking at what do they teach, how are they hired, or would they? Well, if the statement was, I think you said, that all of our faculty weave in our mission, which is Catholic tradition. Is that your question? Okay. Then, yes, if something that explicit would presumably, I mean, I'd have to see the context and all that, but I would say presumably, yes, and when it is holding its faculty out as having a specific role in what it says in its mission, that is where the board would take a look and see, as a factual matter, if that was true and the board would probably have- Wait, wait. As a factual matter, what was true? If they were holding, as a factual matter, if the statements that you presented in terms of the mission and what it was presenting the role of the faculty in, if those held up, then yes. If those statements were made. If the statements were made. You wouldn't verify whether or how they were followed. No, it would be, the primary task is the holding out of the university itself. Saying that faculty- And so, it would be even clearer if there were a sentence in the adjunct faculty's contract. Yes. Just said, you know, as you know, this is a Catholic university with a Catholic mission and our entire teaching mission reflects that period. And then, you're being hired to teach calculus, six hours a semester, here's your pay, you don't have to come to colloquia, thank you very much, you know, do good and don't undermine, you know, don't speak ill of the Pope and we'll be happy. Sure, that would certainly be a much different case and exempt. Has the executive done that here? Isn't that the argument here? That you're asking sort of a magic word test here. That Duquesne's point is it has all these documents that signal to anyone who wants to teach there that they're coming into a religious environment and must teach accordingly. Right, I think that the concept here that might help me explain this is the market check concept from the first part of the holding out test in Great Falls, which is according to Judge Piller's hypothetical, the board test is how the university holds itself out such that a reasonable perspective applicant for being an adjunct or an adjunct would understand their role in creating or maintaining. And so, if there is something in their pamphlet that they're passed out to that says something like that, it would be quite a market check if there were faculty who, for example, did not want to teach whatever their subject was with an eye towards or infusing it with the religious mission of the university. But I think it's important to understand what Duquesne and Amiki are saying that it can be religious even if they're not infusing in any substantive way their teaching. But they want to be able to define the way they bear their mission. And in fact, I mean, this comes up in the Lutheran cases where the Lutherans are all about academic freedom. And so, you know, some of the board's argument that is based on that can be consistent with the way they bear and carry out their religious mission. They just, and I think my question to you is, do you understand the holding out test to limit entanglement by taking their word for it? And the thing you're looking for is the scope of the definition of faculty. You're not looking for any kind of teaching. You're not looking for any curricular, you know, proselytizing or, you know, religious doctrine or, you know, pastoral care by the faculty. You're just looking at some clarity with respect to are they in or are they out? Yes, the board's view, that is the board's view. The board's view is that taking a look at the role of the faculty in creating or maintaining the religious environment is not delving into the religious environment itself. But the handbook itself here says the teacher should respect the religious and ecumenical orientation of the university. Isn't that a signal to adjuncts that if you needed one? Yes, there is in there that general statement to respect the mission. That is correct. According to the board's view, though, there's a difference between respecting the mission of the university and actually creating or maintaining the mission of the university via your role as the adjunct. So the board, and I think the board found it, indicating that statements such as that respecting are too generalized to indicate that the reasonable adjunct would know coming in to teach whichever class that it is. Again, theology separate, theology out of the unit, that they would know coming in beyond just respecting the religious mission, that they have a role in creating or maintaining it. And that's what the board's view. It turns on them meaning the word respect, right? We go to the dictionary and look what the word respect means. That's an often crabbed way to approach something central as religious. I would respectfully disagree that it's crabbed. I would say, however, the board was trying its best to respect, using that word, this court's jurisprudence and Catholic bishops in trying to wrestle with. At least for this judge, given the history here. I notice that I'm over time. I can continue if it's. I know you've been asked this in some form. We're bound by our precedent. I know the board cases go up to all the different circuits, but we're bound by our precedent. And the board has all but said in St. Lutheran that it's not entirely in agreement with our precedent. Is there any way we can affirm? We don't believe that what the board did here is inconsistent with your precedent in Great Falls. We think that the test, although it's a different test, consistent with it in the sense that it refines in the, it refines the holding out test to also apply to faculty. So, we do think that this test is one that this panel can affirm. Now, should the panel disagree and believe that it's inconsistent, obviously the board would not have any problems should the panel think that it needs to be referred for en banc. But the reason that the board, in reading Pacific Lutheran, the board respected Great Falls, recognized this issue was never presented in front of this court, and believes that consistently with that test, this panel can affirm it. All right. Thank you very much. Counsel for Petitioner? Oh. I beg your pardon. Counsel for individual? Jim Kappos for the Steelworkers Union. Duquesne University didn't only hold itself out as a religious university, providing a general religious education environment. Duquesne also very specifically committed itself to allow its non-theology department professors to carry out their jobs according to accepted norms of academic freedom. And that has actual meaning. And it's well understood meaning in the academic community and also in the law. In Tilton, the court said that what that means is that when a university has committed itself to those standards, in that case a religious university, it means, and I'm going to quote, that courses are taught according to academic requirements intrinsic to the subject matter and the individual teacher's conception of professional standards and an atmosphere of academic freedom rather than religious indoctrination. But, Mr. Kappos, I'm not sure that I follow entirely the dichotomy that you're painting between a religious university and a university that is committed to academic freedom. Because a university, I believe, can be committed to academic freedom, inquiry, teaching, but also have a religious mission that encompasses the faculty. And they might, for example, have lifestyle requirements that are more religious, but in the classroom the professor's word is how the professor thinks the professor should teach. So I'm not sure. Well, that's actually the entire point I'm trying to make, is that a college can both be a religious college and provide an education that allows the faculty members in certain nonreligious and many nonreligious subjects to teach according to norms of academic freedom. They can do both. But they're saying, I mean, I think it would help me, actually, if both sides would be a little bit more concrete about what they're envisioning. When you envision collective bargaining, I'm assuming you're envisioning bargaining over wages and hours and bargaining over leave, and they're assuming bargaining over employee grievances that somebody was fired because they were in an out-of-wedlock relationship or involved with a divorced person or having a child out of wedlock. And I think they're sort of talking past one another. Well, I don't think so. I mean, all of those things can be dealt with. All of those issues are dealt with under Title VII all the time. If one were a religious school committed to academic freedom and they wanted to discipline a faculty member for personal behavior that they thought was not upholding the religious standards, that would have nothing to do with academic freedom, right? It may or may not, depending on, like, what the norm was. But if it was just general behavior, I suppose it may not. But that arises, presumably, with respect to the janitors, too. I mean, it arises with respect to any employee. And there's no way that Catholic bishop can possibly be read as stretching beyond the teachers to the institution because that's exactly the approach that the court rejected in Catholic bishop. Mr. Coppes, you used a phrase, a non-religious subject. It's my understanding from what Duquesne has argued, what Ms. Murphy has argued, that for a religious school, there is no such thing as a non-religious subject. That everything is all pursuit of knowledge. All pursuit of knowledge is a religious quest. In terms of the college's mission, the college, I'm sure, thinks of its whole mission as a religious mission. But that doesn't mean that the particular employees are carrying out a religious function. And the fact that the college thinks of that as part of its religious mission just doesn't address the Catholic bishop problem. In the Catholic bishop problem, the court was very clear about what it was. It was, what do you do about teachers who are, quote, under religious control and discipline? And the problem was danger that religious doctrine will become intertwined with secular instruction. Duquesne has declared that that will not happen with respect to subjects like math and science and many other subjects on its campus. It didn't just passively suggest that. It forcefully declared it. That's how it got accredited. It committed itself to that. So when you talk about the way it presents itself to the public, it is very important to the public to know that the math courses are going to be taught according to the subject of calculus rather than have some religious control placed on the professor or science or history or any of these other subjects. And Duquesne has been very clear about that. And the question in this case is, should the board accept Duquesne at its word and say, OK, those professors, the theology professors are under religious control. We see what that is. That's very clear. The other professors are very clearly not. And that's just a line the Catholic bishop requires them to draw. And indeed, you know, if you think about other religious colleges, you have to draw that line. The example that comes to mind for me is Emory University. It's a nonprofit university. It's affiliated with Methodist Church. It very much holds itself out as not providing a general religious environment. Yet, nevertheless, it has the Canberra School of Theology, which ordains Methodist ministers. So if it's an all or nothing, in or out, depending on what the university generally says, then the Canberra School of Theology is not exempt under Catholic bishop. And you can't possibly mean to say that. So once you get into drawing lines, accepting the university at its word is what this court said it should do. I'm very false. It makes a lot of sense. It's also what the academic norms require. It's what the 1940 statement provides for. Well, what about the university's response that it added a limitation? I'm sorry, I couldn't quite. What about the university's response that it added a limitation? Yeah, I think that that's very telling. Their limitation is. That's what? It's very telling what they point to. Yes, you shall respect the university. And then when they elaborated with that, it's so vague that it doesn't satisfy the limitations caused in the 1940 statement. But when they elaborate on what it means when the president says what it means, he says, well, you can't gratuitously criticize our mission. Well, every employer requires that. That's not a religious limitation. And they don't present themselves. But the limitation I'm referring to is the fact that a teacher should not do anything to disparage questions. Well, I don't know that. I don't remember. In other words, if he was teaching biology, there would be limits on that. No, they've declared. They had a very helpful hypothetical in their brief where they hypothesized a biology teacher being punished for answering a question about evolution in a way that contradicted religious doctrine. That's exactly what they've told the public they will not do. And they've been very clear about that. And if they do that sort of thing, then they're going back on their own word. But I think part of their concern is what if they were accused of having fired someone on that ground, and they don't want to have to have that be adjudicated. And I believe the board's position would be that as a backstop to any limitation on the exempt faculty, anyone else in the university who tried to raise that as a ground, there would be a case-by-case. You know, we're not going to go into that. We're going to... Well, the board could do a case-by-case. I mean, the only way it would arise before the labor board is in the very odd circumstance where a union activist was fired on the pretext that they had said something in class that violated doctrine. And if it got down to deciding whether the university sincerely believed that the person, what they said, violated doctrine, there are Title VII cases that handle that all the time. The problem is much more likely to arise under Title VII, because sex is much more likely to be subject to religious strictures than union organizing. And Title VII law handles that. They just say at one point, if it gets down to it and you can't tell, the university wins. If what you're doing is having to make a judgment about whether that's really your belief, okay, you say it is. We don't have any reason to think otherwise. Objectively, you win. But that's not a big problem. That's a very little problem. And it's handled all the time under the law. You know, teachers are covered by Title VII. That's why the ministerial exception is such a big deal. People in a religious school are subject to Title VII, and the world goes on, and it doesn't create a big problem. The university has been bargaining with, I think they said, four unions for decades, and subject to all kinds of NLRB proceedings, as the regional director points out. They can't come forward with one instance where that conflicted with their religious mission. So it's just, I mean, and particularly ridiculous for this bargaining unit, because these are people who are hired on an ad hoc basis, term by term, under very exploitative conditions. And the notion that bargaining for their wages and maybe their insurance benefits is going to interfere with Duquesne's religious mission, I just think is, I don't know. Anyway, all right. Thank you. Thank you. All right, counsel for petition. Thank you, Your Honor. I'll try to be quick. Just a couple of things. First of all, just to reiterate our position, a university holds out its faculty as religious by holding itself out as religious. Maybe it would be more helpful for the court not to just repeat, but to respond to some of the things counsel for the board and counsel for interveners stated. I mean, I don't know if you want to get into the issue of accreditation, but that's a fairly fundamental issue. Well, if that goes to the issue of academic freedom, and the union doesn't really get it right when it talks about academic freedom, because although, and I'll note that this court said, in great force, that academic freedom is not inconsistent with a religious mission, and I think that's a very important statement by this court, but there is academic freedom at Duquesne. It's proud of that, but it's also a limited academic freedom. So, contrary to what the 1940 AAU statement says, there is an add in the statement that Duquesne makes about academic freedom. It says, teachers should respect the religious and ecumenical orientation of the university. And that's different than the AAUP statement on academic freedom. It doesn't contain that kind of language. And if you look at the submission that Duquesne made to Middlestate, the accreditor body, it's very specific in terms of the limitations of academic freedom. It says, faculty should respect the religious mission of the university. The central conclusion with respect to academic freedom is that academic autonomy is preserved within the context of Duquesne's mission statement. So, it's very different than the way it's presented by counsel for the union. And I will also say that the board's statement that they haven't rejected the Rape Law Test, it's just contrary to what the board says in its own decision in Pacific Lupin. I would direct your attention to page 1409 of the board's decision. They say that Pacific Lutheran, that the Rape Law Test is wrong because it doesn't take into account Section 7 and the Section 7 rights of employees. They clearly are rejecting that test. What they're really trying to do is say to this court, well, we're consistent with Catherine Bishop in trying to sweep this court's decision under the rug in their brief. If you read the brief, that's exactly what they're doing. I don't have anything else, Your Honors, unless you have any questions. Thank you. We will take the case under advisement.
judges: Rogers, Griffith, Pillard